**Charles Grier McCOY, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1316.**

Supreme Court of Alaska.

Nov. 30, 1971.

William H. Fuld, Kay, Miller, Libbey, Kelly, Christie & Fuld, Anchorage, for appellant.

G. Kent Edwards, Atty. Gen., Juneau, Harold W. Tobey, Dist. Atty., Charles M. Merriner, Asst. Dist. Atty., Anchorage, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

ERWIN, Justice.

Appellant Charles Grier McCoy brings his appeal from his conviction of the crime of unlawful possession of cocaine. After trial by jury McCoy was found guilty and sentenced to four years' imprisonment. Before trial appellant moved to suppress the cocaine which was taken from his person on the ground that its seizure was unlawful. McCoy's suppression motion was denied. In this appeal the only error specified is the superior court's denial of the motion.

At the suppression hearing McCoy testified that he went to the Anchorage International Airport to catch a flight to Seattle. When he presented his ticket to a Western Airlines counter employee, the police arrested him for attempting to pass a forged document, handcuffed him, and, while still in the terminal building, searched him, finding nothing. At this same time, the police removed McCoy's two pieces of luggage which were on the conveyor belt at the Western Airlines counter. The police then took him to the Anchorage Police Station.[1] In an interrogation room at the stationhouse his handcuffs were removed and Officer Weaver ordered him to empty the contents of his pockets onto a table. McCoy stated that Officer Weaver also asked him for his jacket, which at the time was draped over the back of the chair on which McCoy was seated. In the pocket of the jacket, Officer Weaver found a package of cocaine which subsequently furnished the basis of McCoy's drug conviction. McCoy further testified that he was not served with an arrest warrant or a search warrant during the period from his arrest up to and including the time Officer Weaver searched the pocket of his jacket.

At the suppression hearing the trial court also heard testimony from Officers Ronald Rice and George Weaver of the City of Anchorage Police Department. Officer Rice testified that a man named Rund had been rolled in a house of prostitution and his credit card stolen. He further testified that a Western Airlines plane ticket in the name of "R. Jackson" had been purchased with the stolen credit card. The officers stated they went to the Anchorage International Airport and requested a ticket agent at the Western Airlines counter to let them know when the "R. Jackson" ticket was presented. The police were subsequently notified that a reservation for "R. Jackson" had been made for a 10 o'clock flight the next morning. The next morning McCoy presented the "R. Jackson" ticket at the Western Airlines counter and was arrested. Officer Rice told McCoy he was under arrest for passing a forged instrument.[2] While McCoy was in the interrogation room at the City of Anchorage Police Station, Officer Rice went to the district attorney's office to initiate procedures to obtain search warrants covering McCoy's two pieces of luggage and his Anchorage residence. Rice obtained the warrants and carried out the searches.

Officer George Weaver testified to the same facts pertaining to the arrest.[3] Concerning the events which transpired in the interrogation room, Officer Weaver testified that McCoy was taken into the inter-

---

1. According to appellant he arrived at the Anchorage Police Station approximately 30 to 45 minutes after he had been arrested at the airport.

2. McCoy admits that the police informed him that he was under arrest for "attempting to pass a forged document".

3. Officer Weaver testified that Officer Rice told McCoy he was under arrest for passing a forged instrument. On cross-examination of this witness, it was brought out that in his report Officer Weaver had stated that McCoy's arrest was for accessory to forgery.

rogation room at about 9:30 a. m., his handcuffs were then removed, and he was told to empty his pockets. Weaver then searched the pockets of McCoy's jacket, which had been on the back of McCoy's chair, and found a small packet wrapped in aluminum foil and covered with plastic. Officer Weaver opened the packet and found "a white crystalline substance."

Officer Weaver's testimony also disclosed that his search of McCoy was not the standard booking inventory. This was performed later by the jailer. Weaver did not inventory the items he observed, except to list the serial numbers of McCoy's money to check against a list. When he commenced the search, Weaver had no reason to believe that McCoy possessed narcotics. On the other hand, Officer Weaver did testify that his search of McCoy was reflective of standard procedures when prisoners are brought into the interrogation room prior to their being booked into jail. Weaver stated that he returned to McCoy all of his possessions except the cocaine. Weaver further stated that McCoy's possessions were subsequently taken by the jailer when McCoy was booked.

In this appeal McCoy urges three points in support of his single specification of error that the trial court ruled incorrectly in refusing to grant his motion to suppress. He first argues that the airport arrest was unlawful because the police did not act pursuant to a warrant for his arrest and lacked probable cause to arrest him without a warrant. Second, he contends that the search in the interrogation room at police headquarters was too remote to qualify as a search incident to his arrest. Finally, he argues that even if the search of his jacket pocket was incident to his arrest, it became impermissibly intense when the officer

opened that package that was found to contain the cocaine.

## I. ARREST

AS 12.25.030 provides that a peace officer without a warrant may arrest a person

   (1) for a crime committed or attempted in his presence;

   (2) when the person has committed a felony, although not in his presence;

   (3) when a felony has in fact been committed, and he has reasonable cause for believing the person to have committed it.[4]

McCoy contends that since there was no evidence connecting him with the theft of Rund's credit card, or with the subsequent use of this credit card to obtain a ticket from Western Airlines for "R. Jackson", the police lacked probable cause for any belief that he used Rund's credit card to obtain the ticket in question. In Brinegar v. United States, the Supreme Court of the United States defined the term "probable cause" in the following manner:

   Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge, and of which they had reasonably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.[5]

■ On the basis of the record made at the suppression hearing, we believe that the police had probable cause to arrest McCoy. Officer Rice testified that his superior officer on the evening prior to McCoy's arrest had informed him that a man named Rund had been assaulted at a house of prostitution in Anchorage, and that his credit card had been stolen. Rice was further in-

---

4. In regard to subsection (1) of AS 12.25.-030, we said in Miller v. State, 462 P.2d 421, 425–426 (Alaska 1969), that an arrest is lawful

   where the peace officer has perceived facts which would lead a reasonable man to believe that the arrestee has committed or attempted to commit an offense in his presence.

5. 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879, 1890 (1949). *See also* Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142, 145 (1964). In Merrill v. State, 423 P.2d 686, 699, n. 58, (Alaska), cert. denied, 386 U.S. 1040, 87 S.Ct. 1497, 18 L.Ed.2d 607 (1967), we cited with approval the *Brinegar* formulation of probable cause.

formed that someone using Rund's credit card had purchased a ticket from Western Airlines in the name of "R. Jackson".[6] From the foregoing, we conclude that the Anchorage Police had probable cause to believe that the person who was in possession of the "R. Jackson" ticket and who had just presented the ticket at the Western Airlines counter was the same person who had used the stolen Rund credit card to purchase the "R. Jackson" ticket. Thus, McCoy was lawfully arrested pursuant to AS 12.25.030 (3). Furthermore, we think it reasonable for the police to have inferred that in obtaining a ticket from Western Airlines the purchaser of necessity had to sign Rund's name, in order to successfully use the credit card. Given this inference, there appears to have been probable cause for the belief that the person who used the Rund credit card was guilty of forgery[7] or uttering a forged instrument.[8]

■ Admittedly McCoy could have come by the "R. Jackson" ticket in some perfectly innocent manner. It is also possible that there was more than one person who purchased an "R. Jackson" ticket. Yet these possibilities do not negate the facts and circumstances within the officers' knowledge which supplied the probable cause basis for their belief that McCoy had committed a felony. In order to effect a lawful arrest

without a warrant under AS 12.25.030(3), it is not necessary that at the time the arrest is made the peace officer have sufficient evidence for conviction. We think AS 12.25.030(3) must be given a reasonable construction. Thus, we hold that under AS 12.25.030(3) a peace officer, without a warrant, may arrest a person for a felony when the officer has probable cause to believe that a felony has been committed and probable cause to believe that the person committed it.[9]

## II. SEARCH IN INTERROGATION ROOM

McCoy next raises several complex questions concerning the interrogation room search of the pocket of his jacket.

■ It is clear that Officers Weaver and Rice could have, without a search warrant, lawfully searched the pocket of McCoy's jacket when they arrested McCoy at the airport. McCoy asserts that the interrogation room search was too remote in time and place to the arrest to qualify as a search incident to an arrest. On this record we hold that the search conducted at the stationhouse was incident to the arrest. In United States v. DeLeo[10] a warrantless search similar to the one carried out in the case at bar was upheld. There an FBI agent arrested appellant in a drug store pur-

6. Officer Rice further testified that he had received information "that an affidavit of forgery had been obtained from the victim."

7. R. Perkins, Criminal Law 318, 345–46 (2nd ed. 1969). See AS 11.25.010.

8. AS 11.25.020(2). The effective date of the Alaska Credit Card Crimes Act, AS 11.22.010 et seq., was September 30, 1970. McCoy was arrested on January 30, 1970. Consequently, the Alaska Credit Card Crimes Act has no relevance to the disposition of this appeal.

9. *Compare* Miller v. State, 462 P.2d 421, 425–426 (Alaska 1969). See Goss v. State, 390 P.2d 220, 223–224 (Alaska), cert. denied 379 U.S. 859, 85 S.Ct. 118, 13 L.Ed.2d 62 (1964); Merrill v. State, 423 P.2d 686, 698–699 (Alaska 1967). In Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed.

1879, 1890 (1949), the Supreme Court of the United States said:

In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' (citations omitted) And this 'means less than evidence which would justify condemnation' or conviction * * *.

10. 422 F.2d 487 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed. 2d 648 (1970).

suant to an arrest warrant. The agent searched DeLeo for weapons in the drug store and then transported him to local FBI headquarters where another search was made. DeLeo argued that the second search was too remote in time and place to be incident to his arrest. The First Circuit disagreed holding that

> the fact that a suspect, arrested in a public place, has been subjected only to a hasty search for obvious weapons has a reasonable nexus with the necessity of conducting a more deliberate search for weapons or evidence just as soon as he is in a place where such a search can be performed with thoroughness and without public embarassment to him. (citation omitted) While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent— take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence. Were this not to be so, every person arrested for a serious crime would be subjected to thorough and possibly humiliating search where and when apprehended. (citation omitted) We see no constitutional mandate for such a practice. (footnotes omitted) [11]

The view of the First Circuit that a search which is conducted at the stationhouse within a reasonable time of the arrest qualifies as a search incident to an arrest has wide support in the case law.[12] We find the reasoning of *DeLeo* persuasive. We therefore adopt the rule that a search of an arrestee remains incident to an arrest when it is conducted shortly thereafter at

the jail or place of detention rather than at the time and place of arrest. On the facts of the case at bar, we conclude that the interrogation room search of McCoy's jacket pocket was incident to his arrest at the airport.

## III. INTENSITY OF SEARCH

■ McCoy argues that even though a search of his jacket pocket may have been authorized as a search incident to an arrest, the scope of the search became impermissibly intensive when Officer Weaver opened the plastic wrapped foil packet which the officer found in the pocket of his jacket.[13] It is contended that once the foil packet was removed from McCoy's control, the police officer was not endangered by any weapons that might have been concealed in the foil packet, and that any evidence in the foil packet was safe from destruction. In such circumstances, McCoy argues that in order to look inside the packet Officer Weaver should have first obtained a search warrant.

This argument raises the most troublesome questions presented in this appeal, and has provoked considerable disagreement among the members of this Court. Any attempted answer must, of course, first consider the United States Supreme Court's interpretation of the Fourth Amendment since its decisions are binding upon the respective states.[14] The Fourth Amendment states:[15]

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable

11. *Id.* at 493.

12. United States v. Gonzalez-Perez, 426 F.2d 1283, 1287 (5th Cir. 1970) ; United States v. Robbins, 424 F.2d 57, 59 (6th Cir. 1970) ; Cotton v. United States, 371 F.2d 385 (9th Cir. 1967) ; United States v. Clark, 289 F.Supp. 610 (E.D.Pa.1968) ; Annot., 19 A.L.R.3d 727 § 5 (1968).

13. The record does not indicate if the contraband nature of the foil and plastic

wrapped packet was apparent from its exterior. For purposes of this appeal, we will assume the wrappings were opaque.

14. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ; Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

15. Art. I § 14 of the Alaska Constitution is similar.

cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In interpreting this language, the Supreme Court has held that the principle of antecedent justification is so central to the Fourth Amendment that subject only to a few specifically established and well-delineated exceptions "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment. * * * "[16] In this case, however, we deal with a long-recognized exception to the warrant requirement for searches of the person incident to a valid arrest.[17]

For a time the exception, which reached its zenith in United States v. Rabinowitz,[18] was read more broadly than the rule. *Rabinowitz* upheld a warrantless search of the desk, safe and file cabinets in the office where the defendant was arrested. The Court held that since the items seized were in an area within the defendant's "immediate control" the search was reasonable, the relevant test being not whether it was reasonable to obtain a search warrant beforehand, but rather whether the search itself was reasonable.[19] It is not surprising, given the permissiveness of the *Rabinowitz* rule, that police timed their arrests carefully in order to indulge in extensive general searches of the place where defendant was arrested, often his home.[20] This practice was condemned, however, in Chimel v. California [21] which severely limited the permissible scope of the search incident to an arrest exception to the Fourth Amendment warrant requirement

and which is consequently the most appropriate point of departure for our analysis of the search of the packet.

In *Chimel*, after the defendant was arrested in his home for burglary pursuant to a valid arrest warrant, the police officers conducted an extensive warrantless search of his home and uncovered various items which were subsequently introduced at defendant's trial over his objection. The United States Supreme Court reversed the California Supreme Court which had held that the warrantless search of defendant's home was justified as incident to a valid arrest. The Court held that since the search went far beyond defendant's person and the area into which he could reach to obtain a weapon to harm the officer or escape or evidence which he might conceal or destroy that it was unreasonable under the Fourth and Fourteenth Amendments.

In setting out the boundaries of the area which could be searched under the search incident to an arrest exception, the Court in *Chimel* relied on the two rationales for the exception suggested by Justice Frankfurter in his dissent in United States v. Rabinowitz.[22] Frankfurter suggested the exception was necessary

first, in order to protect the arresting officer and to deprive the prisoner of potential means of escape * * * and, secondly, to avoid destruction of evidence by the arrested person. * * * From this it follows that officers may search and seize not only the things physically on the person arrested, but those within his immediate physical control.[23]

16. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576, 585 (1967) (footnotes omitted).

17. *E. g.*, Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652, 655 (1914) (dictum).

18. 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

19. *Id.* at 66, 70 S.Ct. at 435, 94 L.Ed. at 660.

20. Note, Scope Limitations for Searches Incident to Arrest, 78 Yale L.J. 433, 435 (1969).

21. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

22. 339 U.S. 56, 68, 70 S.Ct. 430, 437, 94 L.Ed. 653, 661 (1950).

23. *Id.* at 72, 70 S.Ct. at 438, 94 L.Ed. 663–664.

Thus, in *Chimel* the Court said:

> [I]t is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. * * * There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control' * * *.
>
> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs * * *.[24]

Since there was no danger that Chimel would obtain weapons or destructible evidence from areas of the house outside his immediate control, the Court held the search was "unreasonable" under the Fourth and Fourteenth Amendments.

Our dissenting brothers suggest that Frankfurter's twin rationales also supply the analysis for judging the propriety of searches of the arrestee's *person* as well as his environs. They reason that after the officer had taken possession of the packet there was no danger that McCoy might remove from it a weapon, an implement of escape, or destructible evidence. Consequently, they argue, the exigency justification of the search evaporated and the warrant requirement attached.

We do not believe that this is a correct interpretation of *Chimel.* While it is clear from *Chimel* that the twin rationales sug-

gested by Frankfurter supply the appropriate analytic scheme to define the area "within [the arrestee's] immediate control",[25] it by no means follows that they also supply the appropriate analysis for limiting searches of the arrestee's person; further, there is language in *Chimel* which suggests that the court did not intend them to do so. *Chimel* was concerned not with searches of the person, but with the wide-ranging warrantless searches of dwellings which *Rabinowitz* had legitimized on the ground that it was the "place" where the arrest occurred. The scope of the problem prior to *Chimel* is apparent from a reading of Harris v. United States,[26] which upheld the introduction of evidence from a five-hour warrantless search of a four-room apartment as incident to an arrest in the apartment. Thus, while *Chimel* overruled *Rabinowitz* and *Harris*, the Court was careful to distinguish Weeks v. United States,[27] in which Justice Day had stated in dictum that English and American law had always recognized the power "to search the person of the accused when legally arrested, to discover and seize the fruits or evidences of the crime."[28]

Moreover, the passage from *Chimel* quoted above and the following passages support the conclusion that the Court did not intend to limit the intensity of searches of the person incident to a lawful arrest but was concerned instead only with limiting searches of the area surrounding him when he was arrested:

> The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. *There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area.* The scope of the search was, therefore,

24. 395 U.S. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694.

25. *Id.*

26. 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

27. 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

28. *Id.* at 392, 34 S.Ct. at 344, 58 L.Ed. at 655.

'unreasonable' under the Fourth and Fourteenth Amendments, and the petitioner's conviction cannot stand.[29] (emphasis added)

\*   \*   \*   \*   \*   \*

No consideration relevant to the Fourth Amendment suggests any point of rational limitation, once the search is allowed to go beyond the area from which the person arrested might obtain weapons or evidentiary items. *The only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other.*[30] (emphasis added)

The last two sentences are critical. The Court is saying, it seems to us, that once warrantless searches beyond the area of the arrestee's immediate control are allowed, the Fourth Amendment with its "reasonableness" requirement suggests no rational limits to circumscribe the search. Searches of the person, on the other hand, have their own inherent physical limitations. Thus, there is less danger that this exception to the warrant requirement will become unrestrained. We do not mean to suggest that no limitations on incidental searches of the person would be appropriate, but rather that those dangers of unlimited expansion of the scope of the search present in the case of searches of dwellings are not present here. *Chimel*, however, would not seem to impose the additional restriction that the incidental search be allowed only when there is danger to the police officer or to the evidence; that opinion was simply not directed at the problem now before this court.

A similar reading of *Chimel* is advanced by the United States Court of Appeals for the First Circuit:[31]

We read *Chimel* as being acutely concerned about the increasing legitimation of wide-ranging warrantless searches of lodgings and buildings based on the fortuity of arrest on the premises, which had been ushered in by United States v. Rabinowitz, (citation omitted). That search of the person was not the evil addressed is apparent from the early references in *Chimel*, distinguishing Weeks v. United States, (citation omitted) and Carroll v. United States [267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.] (citation omitted), and from the Court's own language. \* \* \*[32]

A second point requiring discussion is that to accept appellant's argument that a warrant was required to look inside the packet would require us to fashion a distinction between the power to search and the power to seize which has not been recognized by the cases in this area. McCoy concedes that under *Chimel* the police had the power to *seize* the packet to prevent the destruction of its contents or their use against the officers, but argues that a warrant was required before it could be searched. The Supreme Court cases, however, have treated the power to search and the power to seize as concomitants although it is debatable whether the Court has focused upon this issue. Appellant argues, and our dissenting brothers imply, that sup-

29. 395 U.S. at 768, 89 S.Ct. at 2043, 23 L.Ed.2d at 697.

30. *Id.* at 766, 89 S.Ct. at 2041, 23 L.Ed. 2d at 695–696 (footnotes omitted).

31. United States v. DeLeo, 422 F.2d 487 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970) (footnotes omitted). *See also* the quote from *DeLeo* at n. 10, *infra*.

32. *See also* United States ex rel. Muhammad v. Mancusi, 432 F.2d 1046 (2nd Cir. 1970), cert. denied 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1971), and People v. Bevlin, 275 Cal.App.2d 955, 80 Cal.Rptr. 382 (1969). In *Muhammad* the court upheld a warrantless search of an arrestee's wallet and briefcase made at FBI headquarters after defendant had been arrested at another location and there subjected to a cursory search. In *Bevlin* the court argued that *Chimel* permits searches of such "normal *extensions*" of a person as a woman's purse or a man's briefcase even though they were not in the arrestee's immediate possession at the time of arrest. It is not necessary here, however, to consider the propriety of such searches.

port for the purported distinction between search and seizure can be found in the rationale for the stop-and-frisk cases, Terry v. Ohio,[33] and Sibron v. New York.[34] Thus, in *Terry* the Court in upholding the introduction of a pistol discovered in a frisk for weapons, cautioned

> that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope. * * * The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible.[35]

The exigency having disappeared when the officer seized the packet, the argument runs, the quoted language from *Terry* would invalidate the search. We do not find this reasoning persuasive. While *Sibron* and *Terry* did require that warrantless searches in stop and frisk situations be no more intensive than necessary to uncover weapons endangering the officer, it does not follow that searches of a person incident to arrest should be similarly limited. The stop and frisk doctrine, a limited exception to the rule that officers can detain a person only on probable cause, is designed to aid police officers in street encounters where suspicious circumstances exist not amounting to probable cause.[36] After a proper arrest on probable cause, however, the same reasons for so severely limiting the search are not present. The scope of a protective search for weapons in a stop and frisk situation should be more limited than a search incident to an arrest, for even under the dissent's reading of *Chimel* an additional justification is present, namely, the need to prevent the destruction of evidence. Further, although in *Chimel* the Court approved the application of the

*Terry-Sibron* reasoning to the "search incident to arrest" principle,[37] it did so to define the limits of incidental searches of the area surrounding the arrestee at the time of arrest and not to restrain incidental searches of the person.

That *Sibron* and *Terry* do not support the suggested distinction between the power to search and the power to seize is also a necessary conclusion of a careful reading of the companion case to the decisions, Peters v. New York.[38] Peters was convicted on the strength of burglary tools uncovered in a search of his person for weapons. The search was conducted after the officer had stopped Peters who had been prowling around in the apartment building where the officer lived.

> Officer Lasky patted Peters down for weapons, and discovered a hard object in his pocket. He stated at the hearing that the object did not feel like a gun, but that it might have been a knife. He removed the object from Peters' pocket. *It was an opaque plastic envelope, containing burglar's tools.* (Emphasis added) [39]

The Court held that the officer had probable cause to arrest Peters and that the search was valid as incident to the arrest. What is important for our purposes, however, is that the burglar's tools were inside an opaque plastic envelope. The Court therefore held that it was proper not only to seize the packet but to look inside and search it incident to Peters' arrest. What the Court did *not* require was that the officer get a search warrant before he looked inside the packet. This was so even though the Court stated that the search was justified " 'by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by

33. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

34. 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

35. 392 U.S. 1, 18–19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 903–904 (1968).

36. *See generally* LaFave, "Street Encounters" and the Constitution: *Terry,*

*Sibron, Peters* and Beyond, 67 Mich.L. Rev. 39 (1968).

37. 395 U.S. at 762–763, 89 S.Ct. at 2039–2040, 23 L.Ed.2d at 693–694.

38. 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

39. *Id.* at 49, 88 S.Ct. at 1895, 20 L.Ed. at 927.

the need to prevent the destruction of evidence of the crime.' " [40] These, of course, are the twin rationales for the *Chimel* incidental search exception, upon which appellant's argument is based. Thus, even though the officer's possession of the plastic envelope removed the danger to the officer's person and thereby displaced the exigency justification for the search, the Court held it was proper to look inside without a warrant. Such close facts are highly persuasive; they demonstrate that Frankfurter's twin rationales, crystallized into constitutional doctrine by *Chimel*, do not compel reversal here.[41] Although *Peters* preceded *Chimel*, it contains a strong indication that *Sibron* and *Terry* will not support the extension of *Chimel* claimed by the appellant.

Several other Supreme Court decisions construing the Fourth Amendment also merit discussion. The first is Chambers v. Maroney [42] which upheld a warrantless search of the automobile in which defendant was arrested after it had been seized and taken to police headquarters. *Chambers* is relevant for two reasons. The first is that it contains language which would seem to further undermine any foundation for the purported differentiation between search and seizure:

> Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater'. *But which is the 'greater' and which is the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.* (emphasis added) [43]

The second point is that *Chambers*, by analogy, subverts McCoy's argument that a search of the person incident to an arrest is permissible only if the exigent circumstances justifying the search are present at the time the search is conducted. In *Chambers* the Court permitted a warrantless search after the automobile had been taken to police headquarters and the danger that it and any evidence it contained might disappear was no longer a factor. It was the apparent mobility of the automobile, stopped on a highway with its occupants alerted, that had persuaded the Court in Carroll v. United States [44] to fashion an exception to the warrant requirement. That the Court in *Chambers* permitted a later warrantless search even though the mobility factor was no longer present is a strong indication that the Court would not require the exigency to remain extant when dealing with other exceptions to the warrant requirement.[45] The

40. *Id.* at 67, 88 S.Ct. at 1905, 20 L.Ed. 2d at 937, quoting from Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777, 780 (1964).

41. There was no dissent in *Peters*, although there was considerable disagreement about the *Sibron* reversal.

42. 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed. 2d 419 (1970).

43. *Id.* at 51–52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428.

44. 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

45. The dissenters quote the following passage from Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971) in support of their argument that there can be no warrantless incidental search once the exigent circumstances have disappeared:
'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exception * * * that the exigencies of the situation made that course imperative.'
It is clear, however, that the plurality opinion in *Coolidge* did not overrule

analogy to McCoy's situation is fairly direct. The exigent circumstances were clearly present when the packet was in McCoy's possession at the time of arrest; the search, once justifiable, does not violate the Fourth Amendment remedy because the exigency is removed at the time the search is conducted.[46]

The second case is Katz v. United States,[47] apparently cited by appellant for the proposition that he had a reasonable expectation of privacy as to the contents of the packet. We are not persuaded; the difference between a warrantless "search and seizure" of a conversation in a public telephone booth and a search of a packet in the possession of a person arrested for a crime, evidence of which might well have been contained inside, is readily apparent. The words of the United States Court of Appeals for the First Circuit quoted above are worth repeating here:

> While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.[48]

As a final consideration, it would appear that to place the magistrate between the police and the arrested person by requiring the police to get a warrant before any closed containers on the arrested person are searched, unnecessarily encumbers police investigations without providing any real additional protection for the arrestee. As a commentator in a 1969 law review note stated:

> What a lawful arrest does justify is the search for fruits, instrumentalities and evidence *of the crime for which the arrest is made*, and this is so only because the existence of probable cause for the arrest of a person normally justifies probable cause to believe that the suspect possesses such items. (emphasis in original) [49]

That would seem to be true at least for crimes evidence of which can be concealed on the person, such as the one with which McCoy is charged. It is difficult to imagine a reasonable and intelligent magistrate refusing to grant a warrant in McCoy's case, for example. The packet might well have contained evidence of the forgery. Since the magistrate can be expected to issue the warrant as a matter of course whenever there is probable cause to make the arrest for a crime evidence of which could be concealed on the person, it would be meaningless and time-consuming to require the police to get a warrant. In this regard, the dissenters to Camara v. Municipal

---

*Chambers.* In footnote 20 the Court took special pains to distinguish *Chambers.* It is true that the actual search of the automobile in Chambers was made at the police station many hours after the car had been stopped on the highway, when the car was no longer movable, any 'exigent circumstances' had passed, and, for all the record shows, there was a magistrate easily available. Nonetheless, the analogy to this case is misleading. The rationale of Chambers is that *given* a justified initial intrusion, there is little difference between a search on the open highway and a later search at the station. Here, we deal with the prior question of *whether* the initial intrusion is justified. The invalidity of the *Coolidge* search centered around the fact that there were *never* any exigent circumstances. Mc-

Coy's situation is thus more closely analogous to *Chambers* than to *Coolidge* because at the time of arrest, when the packet was in McCoy's possession, the exigency was present.

46. *See also* United States v. DeLeo, 422 F.2d 487 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970).

47. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967).

48. United States v. DeLeo, 422 F.2d 487, 493 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970).

49. Note, Searches of the Person Incident to Lawful Arrest, 69 Colum.L.Rev. 866, 871 (1969).

Court [50] and See v. City of Seattle,[51] made the following comments which would seem applicable here:

> [The majority] would permit the issuance of paper warrants * * * issued by the rubber stamp of a willing magistrate. In my view, this degrades the Fourth Amendment. * * *
>
>     *    *    *    *    *    *
>
> I ask: why go through such an exercise, such a pretense? * * * Why the ceremony, the delay, the expense, the abuse of the search warrant? (footnote omitted) [52]

To require the police to get a search warrant to search the person of every felony arrestee when it is to be expected that the magistrate will *always* find probable cause that evidence of the crime is on his person, will inundate the magistrates with warrant petitions which will be granted as a matter of course and run the risk that magistrates will not carefully examine the circumstances in more deserving cases.

Certainly the Fourth Amendment guarantee against unreasonable searches and seizures is at the very core of the protections needed to preserve democracy against the excesses of government. Consequently, the mere fact of arrest does not ipso facto justify an unlimited search of the person. In defining the boundaries of incident to the arrest exception, however, the need for the exercise of common sense is apparent.

Although this opinion must not be read as a return to the *Rabinowitz* "reasonableness" approach to Fourth Amendment analysis heartily condemned in *Chimel*, it would seem that once we find ourselves *within* a recognized exception to the warrant requirement faced with the task of defining its scope common sense is not an inappropriate tool.

We think that to require a warrant in the circumstances of this case would be a futile gesture which could hamstring legitimate police action without offering meaningful protection to the arrestee. Adequate protection for the arrestee's legitimate interests in privacy, however, will be provided by the following restrictions on warrantless incidental searches of the person: (1) The arrest must be valid—probable cause for the arrest must exist or the search is unconstitutional.[53] (2) The search must be roughly contemporaneous with the arrest, at least within the boundaries suggested by United States v. DeLeo,[54] and adopted here.[55] (3) The arrest must not be a pretext for the search; a search incident to a sham arrest is not valid. In Taglavore v. United States,[56] for example, where an arrest for a minor traffic violation was used as a pretext to search for marijuana, the court said, "the *search* must be incident to the *arrest*, and not vice versa." [57] (4) Finally, the arrest must be for a crime, evidence of which could be concealed on a person.[58]

50. 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed. 2d 930 (1967).

51. 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed. 2d 943 (1967).

52. *Id.* at 547–548, 554, 87 S.Ct. at 1742, 1745, 18 L.Ed.2d at 949, 952–953 (1967).

53. See, e. g., Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960), Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

54. 422 F.2d 487 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed. 2d 648 (1970).

55. *See* Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) ; *cf.* Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). *See also*, Vale v. Louisiana, 399 U.S. 30, 33, 90 S.Ct. 1969, 26 L.Ed.2d 409, 413 (1970).

56. 291 F.2d 262, 265 (9th Cir. 1961) (emphasis in original).

57. *See also*, Note, Scope Limitations for Searches Incident to Arrest, 78 Yale L.J. 433, 435 n. 14 (1969) ; Note, Searches of the Person Incident to Lawful Arrest, 69 Colum.L.Rev. 866, 870–80 (1969).

58. *See* State v. Elkins, 245 Or. 279, 422 P. 2d 250 (1966). This will operate to prevent unlimited incidental searches in cases of arrests for minor offenses. As one commentator noted:

While we are not bound by the United States Supreme Court's interpretations of the Fourth Amendment in expounding the corresponding section of the Alaska Constitution's Declaration of Rights,[59] article I, section 14, we do not find this case to be an appropriate one to expand those rights in Alaska beyond their federal counterparts. The extent of a valid search of a person charged with a crime is limited under our decision. Where there is probable cause to arrest for a particular crime of a type which can be evidenced by items concealed on the person there is little danger of a pretext arrest. In such circumstances the individual's rights of privacy must give way to the public need to investigate the crime.

Since the search herein was incident to a valid arrest for the crime of forgery, and evidence of that crime might well have been concealed on McCoy's person, the search of the packet was valid and the conviction based on such evidence was proper.[60] The conviction is therefore affirmed.

RABINOWITZ, Justice, with whom CONNOR, Justice, joins, concurring in part, dissenting in part.

I am in agreement with the court's holding that the police had probable cause to arrest McCoy, and further agree that the warrantless stationhouse search of his person was not too remote in the time and place to the arrest to qualify as a search incident to arrest. I also join in the majority's attempt to limit the boundaries of warrantless incidental searches of the person. More particularly, I have no difficulty with, and specifically concur in, the adoption of the following restrictions upon warrantless searches of the person: that the arrest must be valid; that the arrest must not be used as a pretext for a search; that the warrantless search must be conducted contemporaneously to the arrest; and the search must be incident to an arrest for a crime for which there is a likelihood that evidence of the particular crime is concealed on the person of the arrestee. Despite the foregoing, I find that I cannot agree with the court's conclusion that the intensity of the search at issue here can be sustained on the basis of the Supreme Court of the United States' interpretation of the Fourth Amendment.

I think an appropriate point of departure in stating my views is an observation recorded by Justice Frankfurter in the course of his dissent in United States v. Rabinowitz, 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653, 662 (1950). There Justice Frankfurter said:

It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. And so, while we are concerned here with a shabby defrauder, we must deal with his case in the context of what are really the great themes expressed by the Fourth Amendment.[1]

While in most felony cases the incidental search may well turn out to be reasonable, the nexus between the item to be seized and the criminal behavior involved is more difficult to establish in cases involving arrest for such offenses as traffic violations and vagrancy. Automatic application of the incidental search doctrine in such cases * * * may well result in the sanctioning of unreasonable searches in individual cases, contrary to the requirement of the fourth amendment. 69 Colum.L.Rev. at 871.

59. *See* Roberts v. State, 458 P.2d 340, 342 (Alaska 1969).

60. Our disposition of the case makes unnecessary any decision as to the proper scope of an inventory-booking search of a prisoner immediately prior to his physical incarceration. From the testimony offered at the suppression hearing, it is clear that the interrogation room search by Officer Weaver was not part of the customary inventory-booking search procedures at the jail.

1. The Fourth Amendment states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Possession of cocaine is a serious violation of our laws and the opprobium attached to such an offense is not insignificant. In my view, the constitutional implications of this case far exceed its factual limitations. Yet it is against the factual setting of this case that the fundamental rights expressed in Article I, Section 14 of the Alaska Constitution must be considered. There Alaska's Constitution provides:

The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

What is involved in this appeal are the constitutionally protected rights of security of the persons, papers, and effects of all citizens, including McCoy, against unreasonable governmental searches and seizures. In regard to the law of searches and seizures, it is fundamental that

'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption * * * that the exigencies of the situation made that course imperative.'[2]

In my view the fact that a warrantless search incident to an arrest is an exception to the warrant requirement is controlling here. For in order to justify noncompliance with Alaska's constitutional mandate, it must appear that the necessity arising from, or the exigencies of, the situation made it imperative that the search of the packet be carried out without the prior approval of a judge. This analysis in turn requires examination of the common law bases of the search incident to arrest exception to the warrant requirement which the prosecution relies on in this case.

In *Rabinowitz,* both Justice Minton, writing for the majority, and Justice Frankfurter, in his dissent, agreed that the right to search the person of the arrestee incident to an arrest has long been recognized in England and in this country. In Justice Frankfurter's view this right of search is rooted in necessity. Dual rationales are advanced by Justice Frankfurter to this exception to the requirement of a search warrant:

[F]irst, in order to protect the arresting officer and to deprive the prisoner of potential means of escape * * * and, secondly, to avoid destruction of evidence by the arrested person. * * * From this it follows that officers may search and seize not only the things physically on the person arrested, but those within his immediate physical control.[3]

More recently the Supreme Court, in Chimel v. California, 395 U.S. 752, 762–763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694 (1969), in setting limits upon the scope of a premises search incident to a warrantless arrest, reiterated the rationale of the incidental search exception to the warrant requirement of the Fourth Amendment in the following manner:

When an arrest is made, it is reasonable for the arresting officer to search the

2. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971) (footnotes omitted).

3. United States v. Rabinowitz, 339 U.S. 56, 72, 70 S.Ct. 430, 94 L.Ed. 653, 663–664 (1950) (citations omitted).
    In the prior case of Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652, 655 (1914), Justice Day, by way of dictum, said that it had always been recognized under English and American law that the government had the right "to search the person of the accused when legally arrested, to discover and seize the fruits or evidences of the crime." *Weeks* marks the Supreme Court of the United States' earliest approval of the warrantless search incident to a lawful arrest.

person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

Thus it is clear that it has long been the view of the Supreme Court that the exception permitting a warrantless search incident to a lawful arrest is grounded on the twin rationales alluded to by Justice Frankfurter in his dissent in *Rabinowitz*. In my view these rationales perform dual functions in the resolution of issues arising from searches of the person. On the one hand, they provide the theoretical and practical justification for departure from the constitutional requirement that searches be conducted pursuant to warrants. On the other hand, these same rationales furnish appropriate criteria for delineation of the intensity of a warrantless search of the person incident to a lawful arrest. For it strikes me as logical to conclude that once the possibility of the arrestee's escape is prevented, the officer's safety insured, and the danger of concealment and destruction of evidence of the crime for which the arrest, is made eliminated, then there no longer exists any necessity, or exigency, justifying continuation of the warrantless search of the person of the arrestee. Therefore, at the moment Officer Weaver gained control over the small opaque packet, the danger of its destruction or concealment passed, and thus no exigency or necessity remained to justify the officer's opening of the packet without first obtaining a search warrant. In order to lawfully search the interior of

the small packet and seize its contents, once the dangers of concealment or destruction were no longer relevant considerations, it was incumbent upon the police to persuade a neutral and detached judge to issue a search warrant authorizing the search of the packet for evidence of the crime of forgery.[4]

I think this analysis is in accord with the general underlying purposes of both the federal and Alaska constitutional prohibitions against unreasonable searches and seizures. The basic protection afforded by these respective constitutional guarantees is to shield the individual's privacy against generalized exploratory intrusions by government officials. Unless all exceptions to the search warrant provisions are carefully drawn to require a showing of necessity for any departure from the warrant requirement, these constitutional prohibitions will be rendered ineffectual. The need to draw these exceptions carefully is of paramount significance because the great bulk of searches, both of the person and of premises, are warrantless searches conducted incident to arrests.[5] The search at issue in this case is reflective of the norm rather than the exception.

I do not embrace the majority's sanguine conclusion that searches of the person, because of inherent physical limitations, present less danger of unrestrained search than searches of premises. Nor can I read Article I, Section 14 of the Alaska Constitution as creating a hierarchy of protected rights with the right of security of the person accorded a low station in this hierarchy. Nor can I subscribe to the theory that notions of common sense can be employed to subvert a clear constitutional preference for searches conducted pursuant to search warrants. Rather than adopt the majority's concept of spatial limitations regarding warrantless

---

4. The record is inconclusive as to whether either officer could have demonstrated probable cause for the belief that the packet contained cocaine or any other unlawful drug.

5. ALI Model Code of Pre-Arraignment Procedure, Part II, Search and Seizure, xviii-xx (Tent. Draft No. 3, 1970).

searches, I read Alaska's Constitution as requiring that the intensity of all warrant-less searches of the person be limited by the necessity, or exigency, which provides the basis for the exception.

Thus I reach the conclusion that it was constitutionally impermissible for the officers in this case to search the interior of the packet and seize its contents once they had gained possession and control of it, because at that point there was no danger that McCoy could either conceal or destroy the packet. This is not to say that it is unconstitutional for a police officer, incident to a lawful arrest, to conduct a search for weapons in order to effect the arrest with all practicable safety to the officer, arrestee, and others. It is also permissible for the arresting officer, incident to a lawful arrest, to conduct a search for evidence of the commission of the offense for which the arrest has been made, provided there is a likelihood that evidence of this particular crime is concealed on the person of the arrestee. It is clear that such warrantless searches are permissible and may be conducted if, and to the extent that there is reasonable cause to believe that it is necessary to effectuate these purposes.[6] On the other hand, the limitations, I would adopt require that once the officer has gained possession and control over items such as containers, packets, and bill-folds which might contain evidence of the crime for which the arrest is made, it then becomes incumbent upon, and it is the duty of the officer, to obtain a search warrant in order to conduct a search of the interior of such articles. Again this is so because after the officer has gained possession and

control of an article, it is no longer in the power of the person arrested to destroy or conceal the article or its contents and thus the rationale for the warrantless intrusion no longer exists.

Admittedly, the test I would adopt, and its application to the particular facts of the case at bar, is not required by any decision of the Supreme Court of the United States which has construed the Fourth Amendment. On the other hand, no decision of that Court has really dealt with the question of intensity of warrantless searches of the person. Given the pervasiveness of the practice of warrantless searches incident to lawful arrests, I view this area of search and seizure law as singularly appropriate for the development and explication of constitutional principles. In articulating our role in constitutional adjudications under the Alaska Constitution, we have said that our task involves more than passive deference to the decisions of the Supreme Court of the United States when parallel state constitutional provisions are at issue. More to the point in Baker v. City of Fairbanks, 471 P.2d 386, 402 (Alaska 1970), we said this court "should be moving concurrently to develop and expound the principles embedded in our constitutional law."[7]

Although no decision of the Supreme Court of the United States appears controlling here, I cannot agree with the majority's conclusion that none of the Supreme Court cases on stop and frisk or search and seizure[8] offer any guidance as to the proper mode of analysis of the packet search issue in the case at bar. Admittedly these decisions are all

6. The purposes being to effect the arrest and to insure the safety of the arresting officer and others, as well as to prevent the concealment or destruction of evidence of the commission of the crime for which the arrest was made.

7. See also State v. Browder, 486 P.2d 925, 936 (Alaska 1971); Glasgow v. State, 469 P.2d 682, 686 (Alaska 1970); Roberts v. State, 458 P.2d 340, 342 (Alaska 1969).

8. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Sibron v. New York (and companion case, Peters v. New York), 392 U.S. 40, 20 L.Ed.2d 917 (1968); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, 694 (1969); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

distinguishable, yet I think a fair distillation furnishes the basis for formulation of a rule that the intensity of a warrantless search should be limited to the purpose which justifies its exception to the Fourth Amendment's requirement of a warrant.[9] Nor do I find the majority's expediency-rubber-stamp prediction either necessary or compelling. It assumes that our trial judges will default in the performance of their judicial obligations by automatically granting applications for warrants, and further assumes that this court will condone such practices.[10] Granted it is time consuming to obtain a warrant, but this is precisely one of the factors which our Founding Fathers weighed in fashioning constitutional protections against unreasonable searches and seizures.[11] For my part, I would rather a neutral judge determine whether a warrant should issue and read the constitution as having made this very choice.

Unless one is prepared to hold that once a person is arrested all expectations of privacy are destroyed, I believe the limitations on warrantless incidental searches as espoused in this separate opinion comport with the underlying purposes of our constitutional provisions proscribing unreasonable searches and seizures.[12] The alternative invites unrestricted intrusions into the arrestee's body cavities and his body, together with minute inspections of his wearing apparel and all items of property found on the arrestee's person.

9. *Compare* Caver v. Kropp, 306 F.Supp. 1329 (E.D.Mich.1969), in which an approach similar to that taken in this opinion was used. *See* AS 12.35.070.

10. Given the smallness of the packet and other revelant facts in this record, I think it unlikely that the police would have been successful in obtaining a search warrant for the interior of the packet.

11. In the case at bar it appears that it was no great burden on the police to obtain a search warrant authorizing the search of the two pieces of luggage McCoy had with him at the airport, as well as a search warrant for McCoy's home.

12. Even United States v. DeLeo, 422 F. 2d 487 (1st Cir.), cert. denied, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970), which is relied upon by the majority, recognizes this principle. There the court said:

> While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.

*Id.* at 493 (footnotes omitted).