Merle G. WILSON, Appellant,

v.

STATE of Alaska, DEPARTMENT OF CORRECTIONS, Appellee.

No. S–11120.

Supreme Court of Alaska.

Jan. 20, 2006.

---

3. Op. at 822.

Merle G. Wilson, pro se, Palmer.

Marilyn J. Kamm, Assistant Attorney General, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Alaska Statute 33.30.081(b) and 22 Alaska Administrative Code (AAC) 05.585(a) require the State of Alaska to transport a released prisoner to the "place of arrest." Merle Wilson argues that, because he was arrested at his home, the statute and regulation required the state to return him to his home on Columbia Cove, 3.5 miles by footpath or skiff from Tenakee Springs, when it released him from prison in May 2002. We conclude that the state's policy of transporting released prisoners to the community nearest the exact location of their arrest is, under the particular circumstances of this case, a reasonable interpretation of the statute and regulation. Because it was not unreasonable for the state to conclude that Columbia Cove was within the community of Tenakee Springs, the statute and regulation were satisfied when the state offered to transport Wilson to the community of Tenakee Springs. We consequently affirm the superior court order denying Wilson's administrative appeal.

## II. FACTS AND PROCEEDINGS

Merle Wilson was arrested at his home on Columbia Cove, about 3.5 miles from the community of Tenakee Springs, on Chichagof Island. Wilson was eventually convicted of assault in the second degree and imprisoned at the Lemon Creek Correctional Facility in Juneau. As his projected May 2002 release date neared, he asked the Department of Corrections (DOC) to pay for transportation to his home on Columbia Cove. There are no roads to Columbia Cove; it is accessible only by boat, footpath from Tenakee Springs, or floatplane. A chartered flight to Columbia Cove from Juneau would have cost about $350. DOC denied his request, agreeing to take him to Tenakee Springs on a regularly scheduled flight, at a cost that DOC says is about $79. There is a 3.5–mile footpath from Tenakee Springs to Wilson's home on Columbia Cove.[1] The record does not reflect the condition of this footpath, but Wilson did not contend in the agency or superior court pro-

ceedings that it was impassable at the time of his projected May release, that he was physically incapable of traversing the footpath, or that other impediments or hazards might prevent him from walking to his home.

Wilson filed an administrative grievance with DOC alleging that 22 AAC 05.585(a) requires DOC to provide return transportation to a prisoner's "place of arrest." Wilson argued that his "place of arrest" was his home in Columbia Cove. DOC denied his grievance, on the ground that "22 AAC 05.585 is intended to prevent inmates that have been transferred to other state institutions from being stranded in those cities upon their release." DOC informed Wilson that its policy was to "provide [inmates] with transportation to the *city* of their arrest." (Emphasis added.) Wilson administratively appealed this decision through the grievance process. DOC denied his appeal, claiming that it "has consistently interpreted 'place of arrest' as meaning the community closest to the place of arrest."

Wilson was released from prison on May 17, 2002 without DOC-provided transportation. He seems to have arranged at his expense to have himself flown by floatplane to Columbia Cove. Wilson filed a post-release administrative appeal in the superior court seeking a declaratory judgment concerning the meaning of AS 33.30.081 and 22 AAC 05.585 and asking that DOC be required to pay damages equal to the cost of a chartered flight to Columbia Cove and appellate expenses. DOC filed no opposition. The superior court held that "DOC's interpretation of its regulation was not plainly erroneous or inconsistent with the language of the regulation." It denied Wilson's request for damages, reasoning that "the state could reasonably conclude that the regulation is intended to return released prisoners to the community in which they were arrested so as to protect them from being stranded in a city that is not their own."

Wilson appeals.

## III. DISCUSSION

### A. Standard of Review

 When the superior court acts as an intermediate court of appeal in an adminis-

---

1. Wilson states that his property is 3.25 miles from the core area of Tenakee Springs.

trative matter, we independently and directly review the agency decision.[2] Alaska Statute 33.30.081(d) states: "The commissioner of corrections shall adopt regulations governing the furnishing of transportation, discharge payments, and clothing to prisoners upon release from a state correctional facility." The DOC commissioner adopted 22 AAC 05.585 under this authority. When an administrative regulation is adopted under statutory authority, we review the regulation to determine whether it is "consistent with and reasonably necessary to carry out the purposes of the statutory provisions conferring rule-making authority on the agency" and whether it is "reasonable and not arbitrary" considering the legislative purpose.[3] Moreover, we have recognized that "an agency's interpretation of a law within its area of jurisdiction can help resolve lingering ambiguity" and that we should exercise restraint and look for "weighty reasons" before substituting our judgment for the agency's in interpreting a statute or regulation.[4]

**B. Neither AS 33.30.081 nor 22 AAC 05.585 Requires DOC To Return Released Inmates to the Precise Location of Their Arrest.**

■ Wilson argues that AS 33.30.081 gives released prisoners a right to return transportation to the "exact site of the arrest"—in his case, his home on Columbia Cove. He alleges that 22 AAC 05.585 simply restates that right and also outlines the process if a prisoner chooses to be transported to an alternative destination. DOC argues in response that "place of arrest" means the community nearest the location of the arrest.

■ Alaska Statute 33.30.081 states in pertinent part:

(b) The commissioner of corrections shall make available return transportation to the place of arrest for a prisoner who is released from custody in a state correctional facility.

. . . .

(d) The commissioner of corrections shall adopt regulations governing the furnishing of transportation, discharge payments, and clothing to prisoners upon release from a state correctional facility at any stage of a criminal proceeding.

22 AAC 05.585(a) states in pertinent part:

The department will bear the cost of transporting a prisoner to the place of arrest upon release, if the prisoner was admitted into a state facility. If a prisoner declines return transportation, or requests a destination different from the place of arrest, the prisoner must sign a written waiver. Transportation to an alternative site may be provided up to the actual cost of return transportation to the prisoner's place of arrest. . . .

We interpret a statute according to reason, practicality, and common sense, considering the meaning of its language, its legislative history, and its purpose.[5] "The goal of statutory construction is to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[6] We apply a similar analysis in interpreting a regulation.

**1. The meaning of the phrase "place of arrest" is ambiguous in the statute and the regulation.**

■ We give popular or common words their ordinary meaning, if the words are not otherwise defined in the statute.[7] We may also consider how we have interpreted the words in other cases or statutes or how

---

**2.** *Alyeska Pipeline Serv. Co. v. DeShong,* 77 P.3d 1227, 1231 (Alaska 2003).

**3.** *Kelly v. Zamarello,* 486 P.2d 906, 911 (Alaska 1971).

**4.** *Bartley v. State, Dep't of Admin., Teacher's Ret. Bd.,* 110 P.3d 1254, 1261 (Alaska 2005).

**5.** *Grimm v. Wagoner,* 77 P.3d 423, 427 (Alaska 2003).

**6.** *Nat'l Bank of Alaska v. Ketzler,* 71 P.3d 333, 334 (Alaska 2003).

**7.** *Alaskans for Efficient Gov't v. Knowles,* 91 P.3d 273, 276 n. 4 (Alaska 2004) (citing NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47.28 (6th ed.2000)).

administrative agencies have used the words.[8]

"[P]lace of arrest" is not defined in AS 33.30.081 or 22 AAC 05.585. Dictionary definitions for "place" support the conflicting interpretations proposed by Wilson and DOC.[9] Definitions supporting DOC's interpretation of "place" as meaning "community" include: "a portion of space; an area with definite or indefinite boundaries"; "a definite location.... A particular town or city";[10] "an indefinite region or expanse"; and "a particular region or center of population."[11] Definitions supporting Wilson's view that "place" is a precise location include: "a definite location ... A house, apartment, or other abode";[12] and "an individual dwelling or estate: house, homestead."[13]

Wilson argues that "place" was meant to be a precise location rather than a community because 22 AAC 05.585(a) offers released inmates transportation "to an alternative *site*" if they choose not to be returned to their "place" of arrest. (Emphasis added.) But DOC correctly argues that "site" has many possible definitions and could denote either an entire community or a specific building. Definitions of "site" include: "the spatial location of an actual or planned structure or set of structures (as a building, town, or monuments)";[14] "local position of a building, town, monument, or similar work either constructed or to be constructed, esp. in con-

nection with its surroundings"; "scene of an action ... or specified activity";[15] and "a place or location; esp., a piece of property set aside for a specific use."[16]

Wilson argues that we should look to the use of "place" in AS 12.70.070, which authorizes a police officer holding a valid warrant to "arrest the accused at any time and any place where the accused may be found within the state." But the meaning of "place" is no more specific in that statute. "Place" could mean either the precise location or, more broadly, the community encompassing the exact place of the arrest.

DOC responds that AS 12.70.070 has no relevance here. It points to Alaska Criminal Rule 4(c)(2),[17] which describes the territorial limits of an arrest warrant as "any place" within the jurisdiction of the State of Alaska. DOC points out that the arresting officer need only indicate the community where the offender was arrested as the "place of arrest."[18] We do not find this use of "place of arrest" to be helpful in interpreting AS 33.30.081.

Our prior opinions have used "place of arrest" almost exclusively to refer to the exact location of arrest, but those cases concerned search-and-seizure challenges for which the precise location was relevant to determining whether the search was incident to a lawful arrest.[19] These cases do not help us interpret "place of arrest" in AS 33.30.081.

8. *See, e.g., id.* at 276 (looking to usage in prior opinions to help define term "initiative"); *Grimm*, 77 P.3d at 430, 433–34 (stating agency's interpretation of statute, while not binding, can provide "useful guidance").

9. DOC's brief quotes a definition from the fourth edition of Black's Law Dictionary. The more recent seventh edition does not define "place."

10. American Heritage Desk Dictionary 722 (1981).

11. Webster's Third New International Dictionary 1727 (1966).

12. American Heritage Desk Dictionary 722.

13. Webster's Third New International Dictionary 1727.

14. Webster's Ninth Collegiate Dictionary 1102 (1990).

15. Webster's Third New International Dictionary 2128.

16. Black's Law Dictionary 1392 (7th ed.1999).

17. Alaska Rule of Criminal Procedure 4(c)(2) states "[t]he warrant may be executed or the summons may be served at any place within the jurisdiction of the State of Alaska."

18. DOC alleges that an arresting officer must complete a "Return" form which states in part: "I received the above warrant on _____, and executed it by arresting the defendant and serving the defendant with a copy of this warrant in _____, Alaska on _____." The March 2000 version of the same form contains similar language.

19. *See, e.g., Zehrung v. State,* 569 P.2d 189, 193 (Alaska 1977) (noting "place of arrest" as intersection of Boniface and Northern Lights); *McCoy v. State,* 491 P.2d 127, 131 (Alaska 1971)

2. **There is no helpful legislative or administrative history for the term "place of arrest" in AS 33.30.081 and 22 AAC 05.585.**

In the context of prisoner transportation in Alaska, the phrase "place of arrest" first appeared in the Alaska Administrative Code before it appeared in the Alaska Statutes. Until 1986, the pertinent statute was AS 33.30.160(a). It simply provided that "[t]he cost of transporting or transferring a prisoner, either inside or outside the state, after temporary or final commitment shall be paid from the appropriation to the Department of Public Safety." Alaska Statute 33.30.160(b) directed the Commissioner of Health and Human Services to "adopt regulations governing the furnishing of transportation, discharge payments, and clothing to prisoners upon release at any stage of criminal proceedings."[20] Per this authority, the commissioner adopted 7 AAC 60.585, which introduced the concept of returning released prisoners to their "place of arrest" and which stated:

> The division shall bear the cost of transporting a person to the *place of his arrest*, within the State of Alaska, upon release, only after having been admitted into a state institution or contract facility. If a prisoner requests an alternate designation than his *place of arrest*, he must sign a waiver which so states. Transportation to alternative sites selected by him must be provided, or costs paid up to the amount

which it would be necessary to pay for his return to the actual *place of arrest.*

(Emphasis added.) This regulation became effective September 10, 1977.[21] No administrative history brought to our attention reveals what the commissioner. meant by the term "place of arrest" in 7 AAC 60.585.

On January 25, 1985 House Bill 114 was introduced at the request of the governor.[22] The bill proposed a wholesale revision of Chapter 30 of Title 33 of the Alaska Statutes.[23] The bill acknowledged that it would affect administrative regulations and allowed all regulations adopted under the now—repealed statutes to "continue in effect until amended or repealed by the commissioner of corrections."[24] The bill was enacted and signed into law in 1986.[25] As adopted, the bill repealed AS 33.30.160 and enacted AS 33.30.081.[26] There was no discussion of the meaning of "place of arrest" during the legislative process. The only indication of the legislature's intent consists of testimony before the House Judiciary Committee by an assistant attorney general that the section's "intent was to get the prisoner back home."[27] This statement of purpose is not helpful here because "home" might mean either the community in general or an exact location. And "home" is potentially inconsistent with "place of arrest" because the prisoner may not have been arrested at his actual residence or even in his home community.

The language of 22 AAC 05.585 mirrors the language in AS 33.30.081 and former 7

---

(upholding search conducted at police station rather than "place of arrest" as search incident to lawful arrest). *But see Wortham v. State*, 519 P.2d 797, 799 (Alaska 1974) (using broader meaning of "place of arrest" to note that due process requires preliminary hearing on parole revocation "at or reasonably near the place of the alleged parole violation or arrest").

**20.** AS 33.30.160 made the Department of Public Safety responsible for transporting all prisoners. The Department of Public Safety and the Department of Health and Social Services entered into an agreement that made the Department of Health and Social Services responsible for transporting prisoners released from a state facility. *See* 1977 Formal Op. Att'y Gen. 39. The Department of Corrections was then a division in the Department of Health and Social Services. Executive Order No. 55 elevated the Division of

Corrections to a department-level agency. Executive Order No. 55 § 1 (1984).

**21.** Register 63, October 1977.

**22.** House Bill (H.B.) 114, 14th Leg., 1st Sess. (1986).

**23.** *Id.*

**24.** H.B. 114, § 12; ch. 88, § 13, SLA 1986.

**25.** Ch. 88, § 6, SLA 1986.

**26.** Ch. 88, §§ 6, 12, SLA 1986.

**27.** *Minutes of March 30, 1985, hearing before the House Judiciary Committee*, 13th Legislature (1985–86) (statement of Michael Stark, assistant attorney general and DOC counsel).

AAC 60.585 without further explanation. We are unaware of any meaningful administrative history for 22 AAC 05.585.

### 3. DOC's interpretation of "place of arrest" is reasonable and not arbitrary and achieves the policy underlying AS 33.30.081.

DOC argues that its interpretation of AS 33.30.081 is "consistent with the legislative intent to avoid having inmates released from prisons at great distances from their homes without the funds for transportation from the prison to the community nearest to the inmate's place of arrest." Where, as here, there is "lingering ambiguity" about the meaning of a statute or regulation, an agency's interpretation of a law within its area of jurisdiction is helpful.[28] We believe that DOC's interpretation of AS 33.30.081 reasonably achieves the statute's purpose. Because there is evidence that Columbia Cove is within the Tenakee Springs community, DOC's decision to transport Wilson to Tenakee Springs instead of Columbia Cove was reasonable.[29]

DOC's policy of transporting released prisoners to the community nearest their place of arrest has historical support. States have paid for a released prisoner's transportation at least since the early twentieth century.[30] Many early statutes provided transportation for the prisoner only to the community where the prisoner was convicted or to the prisoner's home community.[31]

DOC's policy better achieves the stated legislative purpose of getting "the prisoner back home" than the statutory language itself. DOC allows a prisoner the option of choosing transportation to a place other than the "place of arrest" so long as transportation to the alternative location is not more expensive than transportation to the "place of arrest."[32] This option affords a prisoner who was not arrested in his home community the opportunity to be returned home rather than to the place of his arrest.

DOC's interpretation of AS 33.30.081(b) is consistent with the underlying policy of AS 33.30.081. Other provisions in AS 33.30.081 balance the right of prisoners to appear in court proceedings against DOC's burden of paying the cost of transportation. For example, AS 33.30.081(f) allows a court to order a prisoner to appear only after the court determines that the prisoner's presence is "essential to the just disposition of the action." It also requires the court to provide the Commissioner of Corrections an opportunity to comment and to consider alternatives to a personal appearance, such as deposition and telephonic testimony.[33] The cost of transporting the prisoner to court must be paid by the party requesting the appearance[34] unless the prisoner is the party and is found to be indigent.[35] If DOC is required to bear any cost and the prisoner receives a money judgment, the court can require the prisoner to repay DOC for his transportation costs.[36] In interpreting AS 33.30.081(b), DOC has adopted a policy that "[r]eturn transportation shall be by the most cost-effective and available means."[37] DOC's policy reasonably achieves the legislative purpose of getting

**28.** *Bartley v. State, Dep't of Admin., Teacher's Ret. Bd.*, 110 P.3d 1254, 1261 (Alaska 2005).

**29.** In two affidavits filed in this court, Wilson referred three times to his "home in Tenakee Springs."

**30.** Amos W. Butler, *Treatment of the Released Prisoner*, 1 J. AM. INST.CRIM. L. & CRIMINOLOGY 403, 405 (May 1910 to March 1911).

**31.** *See* L.D. Weyand, *A Study of Wage–Payment to Prisoners as a Penal Method*, 10 J. AM. INST.CRIM. L. & CRIMINOLOGY 558 (May 1919 to February 1920) (collecting early state statutes regulating transportation of prisoners upon release from state facilities).

**32.** DEPT OF CORRECTIONS, *Policies and Procedures, Transportation Upon Release*, Index # 818.07, VI. A–C (Eff. Oct. 1, 1990).

**33.** AS 33.30.081(f).

**34.** AS 33.30.081(g).

**35.** AS 33.30.081(h).

**36.** *Id.*

**37.** Dept. of Corrections, *Policies and Procedures, Transportation Upon Release*, Index # 818.07, VI. B (Eff. Oct. 1, 1990).

"the prisoner home"[38] in a cost-effective manner by providing transportation to the community nearest, or encompassing, the place of arrest rather than to the exact location of the arrest.[39]

DOC's interpretation is also more in line with "reason, practicality, and common sense"[40] because it avoids absurd results. For example, it would not be practical to return a prisoner who was arrested at or near the scene of the crime back to that precise location, which might be the victim's house or office.

DOC's decision to transport Wilson to the community of Tenakee Springs was reasonable given the undisputed facts in this case. It is undisputed that Columbia Cove is accessible from Tenakee Springs by a 3.5 mile footpath; there is no indication in the record that the path was impassable when Wilson was released or that Wilson was physically incapable of using the path. Wilson's sentencing statement, included by Wilson in his excerpt in this case, alleged that Tenakee Springs's regulations govern conduct in Columbia Cove. His sentencing statement also asserted that a community committee was formed in Tenakee Springs to assist with law enforcement issues in Columbia Cove.

There may be circumstances in which it would be unreasonable for DOC to simply transport a releasee to the community nearest the locus of arrest. Indeed, even transporting a releasee to a transportation hub within the community encompassing the site of arrest might be circumstantially unreasonable, because in the larger communities, such hubs might be many miles from the site of the arrest. Consequently, factors such as distance, terrain, physical incapacity, hazardous conditions, and expense might have a bearing on the reasonableness of DOC's interpretation of the statute and regulation in a given case. The ultimate purpose of returning prisoners to their homes or home communities—to prevent "stranding" them—would not be served if they were transported to their home communities but were then prevented from completing the journey by circumstances such as terrain, weather, or expense. Because the facts in this case are undisputed, we need not consider these sorts of circumstances further here or attempt to list the factors that could be relevant.[41]

The undisputed facts in this case support the conclusion that Columbia Cove was part of the Tenakee Springs community. It was therefore reasonable for DOC to provide Wilson with transportation to Tenakee Springs upon his release and it was not unreasonable for DOC to decline to return him to the Columbia Cove beach near his home.

## IV. CONCLUSION

For the reasons discussed above, we AFFIRM.

MATTHEWS, Justice, with whom BRYNER, Chief Justice, joins, dissenting.

The question presented is whether the statutory requirement that "[t]he commis-

---

**38.** *Minutes of March 30, 1985, hearing before the House Judiciary Committee*, 13th Legislature (1985–86) (statement of Michael Stark, assistant attorney general and DOC counsel, on Tape 63, Side One).

**39.** The DOC investigator responding to Wilson's grievance filed a report, which found:

> Mr. Wilson's interpretation of 22 AAC 05.585 is incorrect; the state does not provide an option to be returned to the exact place of arrest upon release. Just as a poacher is not returned to the bush or a bank robber returned to the bank, Mr. Wilson shall not be returned to the exact place of arrest. 22 AAC 05.585 is intended to prevent inmates that have been transferred to other state institutions from being stranded in those cities upon their release, but rather provide them with transportation to the city of their arrest.... Mr. Wilson will be returned to Tenakee upon his release, unless

> he declines or requests an alternative destination of equal value.

**40.** *Grimm*, 77 P.3d at 427.

**41.** Wilson implies in his reply brief that hiking the footpath without a rifle in May, when brown bears are "concentrated along the beaches," would be unsafe. He never raised this contention before the agency or in the superior court or in his opening brief in this court. Although undue hazard, such as from wildlife or weather, might be a factor relevant to the reasonableness of DOC's transportation decision in a given case, Wilson has waived any reliance on that factor here. *See Zok v. State*, 903 P.2d 574, 576 n. 2 (Alaska 1995) (holding that where pro se litigant "provided no substantive argument on point in his opening brief, and only mentioned the court's alleged failure to admit evidence in his reply brief," the issue was waived).

sioner of corrections shall make available return transportation to the place of arrest for a prisoner who is released from custody in a state correctional facility"[1] means that a released prisoner who was arrested at his home is entitled to return transportation to his home, or merely to the public transportation terminus in the community nearest his home. I think the former meaning is right for the reasons that follow.[2]

First, "place of arrest" suggests a particular spot, not a broad geographical area.[3] If the legislature had intended that released prisoners need only be returned to "the community nearest their place of arrest"[4] it probably would have said so.

Second, the legislative history supports the conclusion that it was the intent of the legislature to pay for the transportation of a prisoner to his home if that was where he was arrested. The assistant attorney general who explained the objective of the statute to the House Judiciary Committee testified that the statute's "intent was to get the prisoner back home."[5]

Third, considerations of fairness on which the statute is based also suggest that a literal construction is the right one. Just as it may be unfair to strand released prisoners in the city of their incarceration, it can also be unfair to strand them at the airport or ferry terminal of the community nearest their home. This will be true where the terminal is a significant distance from a prisoner's home and the latter can be reached only by an additional expenditure of money or effort. The general idea of the statute is that since the state has expended the effort to forcibly take the prisoner away from where he was arrested, it is fair that the state expend something like the same effort to return him after he has served his time. Most released prisoners are impecunious and even a cab fare can be a significant burden. Further, where cabs, buses, or water taxis, are unavailable, simply telling a prisoner to take a hike seems like a callous response that is inconsistent with the underlying spirit of the statute.[6]

For these reasons I respectfully dissent.

1. AS 33.30.081(b).

2. In my view this is a question of law on which the court should exercise its independent judgment: "Questions of law which do not involve any particular agency expertise are reviewed under the substitution of judgment standard. Questions of law involving agency expertise are reviewed under the 'reasonable basis test.' " *Arnesen v. Anchorage Refuse, Inc.*, 925 P.2d 661, 664 (Alaska 1996) (citations omitted) (holding that the question whether self-employment as a real estate sales agent is a "job" within the meaning of a provision of the Workers' Compensation Act is a question of law suitable for judicial determination de novo). Here the state does not argue that the term "place of arrest" is something that is uniquely within the knowledge of the Department of Corrections nor, in my opinion, could a reasonable argument to this effect be made. It also follows that, although subsection (d) of the statute instructs the department to issue regulations "governing the furnishing of transportation" to released prisoners, I cannot agree with the court (*see* at 829) that this bland language could authorize a regulation in contravention of the "place of arrest" requirement in (b).

3. Many Alaska communities encompass a broad area, and sometimes much of the area is only thinly settled. Tenakee Springs is an example. According to a state monograph, it is a community of some 100 people, consisting of about 47 permanent households that are situated along a single trail that parallels the north shore of Tenakee Inlet for approximately ten miles. Most of the houses are concentrated along a two-mile stretch near the center of the town, but others are located along the full length of the trail. KEN LEGHORN & MATT KOOKESH, DIV OF SUBSISTENCE, ALASKA DEP'T OF FISH & GAME, *Timber Management and Fish and Wildlife Utilization in Selected Southeast Communities: Tenakee Springs*, Alaska 8, 13 (1987).

4. *See* Op. at 830.

5. At 831 n. 27.

6. Some walks home have special hazards. For example, brown bears are common on the shores of Tenakee Inlet, and a concentration of them exists at Indian River, which the trail from the town core to Columbia Cove crosses. Bear encounters are said to be on the increase both in the town core and Indian River according to the state-sponsored community profile of Tenakee Springs. *City of Tenakee Springs, Tenakee Springs Community Plan* 15–16, 33 (July 26,

2001 Revision), *available at* http://www.commerce. state.ak.us/dca/ plans/ TenakeeSprings rev2001.pdf. Of course it is unlikely that any particular person walking through brown bear

country will actually be attacked, but one can never be certain, and many Alaskans in bear country carry a