Fred A. BAKER, Petitioner,

v.

STATE of Alaska, Respondent.

No. A–9791.

Court of Appeals of Alaska.

April 20, 2007.

---

**27.** *Cox v. Cox,* 931 P.2d 1041, 1045 (Alaska 1997).

**28.** *Id.*

Fred A. Baker, in propria persona, Seward, for the Petitioner.

John K. Bodick, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Respondent.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Fred A. Baker is pursuing a petition for post-conviction relief in the superior court, and he has lodged a petition for review. In his petition, Baker challenges the superior court's failure to enter summary judgement in his favor.

Baker's petition has not yet gone forward because a preliminary problem has arisen: the parties disagree on how to calculate the filing fee that Baker must pay to pursue this appellate litigation.

Baker is indigent and, thus, he would normally qualify for an exemption from this Court's normal filing fee of $150.00. However, Baker is currently a prisoner, and his petition for post-conviction relief constitutes "litigation against the state" as defined in AS 09.19.100(1). Because of this, Baker must pay the mandatory minimum filing fee specified in AS 09.19.010.

Baker and the State agree that Baker's mandatory minimum filing fee must be calculated using the formula specified in AS 09.19.010(d), but they disagree concerning how this formula should be interpreted. The pertinent portion of AS 09.19.010(d) states:

> In setting the [mandatory minimum] fee, the court ... shall require the prisoner to pay filing fees equal to 20 percent of the larger of the average monthly deposits made to the prisoner's account described in (b)(2) of this section, or the average balance in that account, not to exceed the amount of the full filing fee required under applicable court rules.

As can be seen, this subsection requires the filing fee calculation to be based on the average monthly deposits to, and the average balance in, "the prisoner's account described in [subsection] (b)(2) of this [statute]".

Subsection (b)(2) of the statute declares that "a prisoner shall submit to the court ... a certified copy of the prisoner's account statement from the correctional facility in which the prisoner is being ... held for the six-month period preceding the submission of the [prisoner's pleadings]". Thus, the reference in both subsections (b)(2) and (d) is to "the prisoner's account [in] the correctional facility in which the prisoner is being ... held".

The problem is that, following the enactment of AS 33.30.201(d) in 2006, prisoners have two separate accounts: their normal prisoner account (what the Department calls the "funds available" account) which contains money that the prisoner can spend for every-

day purposes, and a "forced savings" account to which the prisoner has no direct access. This forced savings account contains money whose primary purpose is to provide funds for the prisoner when the prisoner is eventually released from custody.

■ The question presented here is whether the money in a prisoner's forced savings account should be considered when a court calculates the prisoner's mandatory minimum filing fee under AS 09.19.010(d).

### The statutory background

In the past, the State of Alaska apparently provided "discharge payments" (colloquially known as "gate money") to prisoners upon their release. This "gate money" was part of the financial assistance package intended to help prisoners re-establish themselves in the community.

However, under 22 AAC 05.590,[1] Alaska prisoners now receive no discharge payment or "gate money" upon their release. This regulation reads:

> Upon release of a prisoner, the department will not provide a discharge payment or gate money to the prisoner. Each prisoner is [only] entitled to receive any work program compensation and prisoner fund account money due [the prisoner] at the time of release.

Thus, when prisoners are released from prison, they receive only the money remaining in their "prisoner fund account" (as well as any wages that have already been earned but that have not yet been deposited into the prisoner's account).

This account was the only prisoner account that existed in 1995 when the Alaska Legislature enacted AS 09.19.010 et seq, the chapter of the statutes that establishes the mandatory minimum filing fee for prisoners pursuing civil litigation against the State. Thus, when the legislature established the rules for calculating a prisoner's mandatory minimum fee, these fee-calculation rules unambiguous-

ly referred to the average monthly deposits to, and the average balance of, this one prisoner account.

But in 2006,[2] the legislature enacted AS 33.30.201(d), a law that requires the Commissioner of Corrections to withhold a portion of a prisoner's wages and place this money into a special "forced savings" account whose primary purpose is to ensure that the prisoner will have some minimal amount of money at the time of their release.

Under AS 33.30.201(d), a prisoner's forced savings account is funded by mandatory transfers of a portion of the prisoner's wages. Subsection (c) of AS 33.30.201 declares that various portions of the prisoner's wages must be disbursed for child support, restitution, utility fees, and the prisoner's normal account (the account that the prisoner can use to make discretionary purchases of clothing, commissary items, etc.). Then, under subsection (d), the remaining money

> [shall] be credited to the prisoner and . . . must be retained by the department for the primary purpose of being available to the prisoner at the time of release. The commissioner shall maintain individual prisoner accounts for those earnings. The commissioner may, however, permit the prisoner to draw on a portion of that money for other purposes that the commissioner considers appropriate.

That is, the money in a prisoner's forced savings account is restricted. Its primary purpose is to provide funds for the prisoner to use when the prisoner is eventually released from custody. Before that time, the money in the forced savings account can be spent only with the approval of the Commissioner of Corrections. The only money to which a prisoner has ready, discretionary access is the money in the prisoner's normal account.

When the legislature created the forced savings accounts in 2006, the legislature did not amend the fee-calculation rule specified

---

1. This regulation was originally enacted as 7 AAC 60.590, when the Department of Corrections was a division within the Department of Health and Social Services. *See* Administrative Register 63, effective September 10, 1977. The

current form of the regulation was promulgated in Administrative Register 101, effective January 9, 1987.

2. *See* SLA 2006, ch. 58, § 7.

in AS 09.19.010, nor did the legislature amend any other portion of AS 09.19 to indicate how they wished to handle the new forced savings accounts. Indeed, even today, the administrative regulations of the Department of Corrections contain no reference to a "forced" or "mandatory" savings account. Instead, these regulations continue to refer to a single "prisoner fund account". *See* 22 AAC 05.105, 22 AAC 05.106, 22 AAC 05.331, and 22 AAC 05.590.[3]

But although there are no administrative regulations governing these forced savings accounts, the Commissioner of Corrections has issued a "policy" that addresses these accounts. In December 2005, apparently anticipating the legislature's passage of AS 33.30.201(d) the following spring, the Commissioner adopted Policy No. 304.01, "Prisoner Wage Disbursal". (A copy of this Policy is appended to this opinion.)

Under Policy No. 304.01, a prisoner's wages are divvied up and distributed according to the following rules, in the listed order of priority:

| | | |
|---|---|---|
| Priority One | court-ordered support for the prisoner's dependents | up to 40% of wages |
| Priority Two | reimbursing the State for violent crime compensation paid to victims of the prisoner's crimes | up to 5% of wages |
| Priority Three | restitution payments ordered by the sentencing court | up to 10% of wages |
| Priority Four | civil judgements arising from the prisoner's criminal conduct | up to 5% of wages |
| Priority Five | fees for the prisoner's utilities; see AS 33.30.017 | actual fees, up to a $3.00 maximum per month |
| Priority Six | personal discretionary uses (*e.g.*, clothing, photocopying, and purchases from the commissary) | up to 25% of wages |
| Priority Seven | fines ordered by the sentencing court | up to 10% of wages |
| Priority Eight | "Mandatory Savings"—*i.e.*, the forced savings account required by AS 33.30.201(d) | 35% of wages until the balance in the forced savings account reaches $250; thereafter, 5% of monthly wages *Exception:* "Inmates serving 8 years or more are exempt from Mandatory Savings." |
| Rule for any Remainder: | | "Any wages remaining after [the foregoing] priorities have been satisfied will be equally allocated to personal use (Priority Six) and mandatory savings (Priority Eight)." |

As the attentive reader will see, the percentages listed in the right-hand column total more than 100 percent. This means that, depending on the amount of money taken from a prisoner's wages under Priorities One through Seven, there may not be much left for the prisoner's forced savings account.

Moreover, even when the forced savings account is fully funded as provided under Priority Eight, the account will grow relatively slowly after the balance reaches $250—because, at that point, only five percent of the prisoner's monthly wages will be distributed to the account.

Prisoners' wages are low. Under AS 33.30.201(a), these wages are essentially capped at fifty percent of the minimum wage. From this Court's experience examining prisoner account statements, it is often the case that only a few dollars per month will be deposited into a prisoner's forced savings account.

---

**3.** Three of these regulations—22 AAC 05.105, 331, and 590—first appeared in Administrative Register 101 (effective January 1987). The fourth, 22 AAC 05.106, was promulgated in 1999; *see* Administrative Register 150 (effective April 1999).

Finally, the Commissioner has declared that "[i]nmates serving 8 years or more are exempt from Mandatory Savings." On its face, this language appears to mean that prisoners who receive sentences of 8 years or more will never have a forced savings account. Seemingly, such a rule would conflict with the statutory mandate that the Commissioner establish a forced savings account for every prisoner. It would also mean that the prisoners sentenced to the longest terms of imprisonment might have little or no money when they are released. Conceivably, this language is meant to convey a different rule—the rule that no "forced savings" deduction will be made from a prisoner's wages until the prisoner has less than 8 years remaining in their sentence. This interpretation is supported by the wording of another portion of the same Policy—section VII–B.3.a. [*Sic:* there is no section VII–B.3.b.] This subsection of the Policy states: "Prisoners who are more than 8 years from their tentative release dates will automatically receive an exemption from the mandatory savings deduction."

### The factual background

Since the enactment of AS 09.19 in 1995, this Court has repeatedly been asked to calculate mandatory minimum filing fees for prisoners pursuing litigation against the State. Because, under AS 09.19.010(d), the mandatory minimum filing fee hinges on "the average monthly deposits made to the prisoner's account ... [and] the average balance in that account" for the preceding six months, any prisoner who applies for a reduction of the normal filing fee must provide the records from their prisoner account. More specifically, the prisoner must ask the prison administration to provide account statements for the prisoner's use.

This Court takes note that sometimes the prison administration furnishes account statements for both the prisoner's normal account and the prisoner's forced savings account, while at other times the prison administration furnishes only the prisoner's normal account statements, with no mention of the forced savings account.

Moreover, in the past, when this Court has questioned why the Department has included a prisoner's forced savings account balance when calculating the mandatory minimum filing fee, the Department's answer has been that the Commissioner has concluded that paying filing fees is an "appropriate" use of a prisoner's forced savings account money—*see* AS 33.30.201(d)—and, therefore, the balance in the prisoner's forced savings account should be included in the filing fee calculation.

But the Department is apparently not applying this policy in a uniform manner.

For instance, this Court has another pending case, *Esmailka v. State*, File No. A–9812, in which the average balance of the prisoner's forced savings account was $891.16. Combining this forced savings account balance with the much smaller average balance in the prisoner's normal account ($59.25), Judge Mannheimer ordered the prisoner, David Esmailka, to pay the full filing fee of $150—because twenty percent of Esmailka's combined balances was an even larger amount of money.

Because Esmailka's normal account did not have sufficient money to cover this $150 filing fee, he attempted—unsuccessfully, it appears—to obtain the needed money from his forced savings account. Esmailka sent a letter to this Court, stating that he tried to draw money from his forced savings account to pay the filing fee, "but [the] DOC Deputy Commissioner denied [his] request." As a consequence, Esmailka explained, he does not have sufficient money to pay the $150 filing fee.

The Clerk's Office treated Esmailka's letter as a motion for full-court reconsideration of the filing fee issue, and the Clerk served Esmailka's letter on the State on March 9th. As of today, the State has filed no response.

These inconsistencies in the Department's handling of this matter have prompted us to re-examine the use of a prisoner's forced savings account when calculating the mandatory minimum filing fee under AS 09.19.010(d). For the reasons that follow, we conclude that the forced savings account balance should not be used for this purpose.

*Why we conclude that the balance in a prisoner's forced savings account should not be used when calculating the prisoner's mandatory minimum filing fee under AS 09.19.010(d)*

As this Court explained in *George v. State*, 944 P.2d 1181 (Alaska App.1997), the mandatory minimum filing fee provisions of AS 09.19 were intended to deter prisoners from filing "endless 'recreational' litigation" and "frivolous litigation". *Id.* at 1186, quoting the governor's transmittal letter that accompanied House Bill 201 (19th Legislature), 1995 House Journal 488–89.

As we noted in *George*, prisoners "often have [little] at stake if they litigate and lose", and "litigation often constitutes a diversion from the monotony of prison life". *Id.*, 944 P.2d at 1188. The legislature decided to try to deter prisoners from filing frivolous lawsuits by placing a modest economic restraint on a prisoner's decision to initiate a lawsuit— that is, by requiring prisoners to pay a mandatory minimum filing fee based on a percentage of their available resources. *Id.* at 1186–88.

AS 09.19.010(d) lists two alternative formulas for calculating this minimum filing fee: twenty percent of the average monthly deposits to the prisoner's account, or twenty percent of the average balance of that account. Under this statute, the mandatory minimum filing fee is the greater of these numbers (unless this number exceeds the normal filing fee, in which case the prisoner must simply pay the normal filing fee).

It appears that the legislature recognized that if the mandatory minimum filing fee were calculated based simply on a prisoner's account balance, this would act as a disincentive for prisoners to save their money. That is, prisoners would soon learn that their mandatory filing fees would be close to zero if they spent nearly all of their disposable income and maintained only small balances in their prisoner accounts.

This would tend to defeat the purpose of the mandatory filing fee (*i.e.*, to inhibit frivolous litigation). Moreover, it would also tend to defeat another important legislative purpose: encouraging prisoners to save for their future. As explained above, prisoners do not receive discharge payments or "gate money" when they are released from prison. The only money they receive is the money remaining in their prisoner account. Thus, any law that gives prisoners an incentive to spend all of their money before they leave prison tends to defeat the rehabilitative goal of having prisoners leave custody with at least a modest amount of money to ease their transition back into society.

Accordingly, the legislature provided an alternate method for calculating the mandatory minimum fee: a percentage of the average monthly deposits to the prisoner's account. Under this alternate calculation, the mandatory minimum fee is based on the monthly average of the money going into a prisoner's account, whether that money is spent or not. Thus, even if a prisoner routinely spends all of their available money, this would not relieve the prisoner of the obligation to pay a significant mandatory minimum filing fee.

As explained above, each prisoner had only one prisoner account when the legislature established the mandatory minimum filing fee in 1995. Thus, when the legislature set the rules for calculating a prisoner's mandatory minimum fee, these rules unambiguously referred to the average monthly deposits to, and the average balance of, this one account. But since 2006, because of the enactment of AS 33.30.201(d), the Department of Corrections is required to maintain a separate "forced savings" account for prisoners— money that "must be retained by the department for the primary purpose of being available to the prisoner at the time of [their] release".

The existence of the forced savings accounts creates an ambiguity in the rules governing the calculation of the mandatory minimum filing fee under AS 09.19.010(d).

Under this statute, a prisoner's mandatory minimum filing fee is calculated by reference to "the average balance in [the prisoner's] account". The question is: should the accumulated money in a prisoner's forced savings account be included when calculating the average balance of the prisoner's account? Or should the calculation of "the average bal-

ance" be limited to the funds in the prisoner's normal account—*i.e.*, the money that is available, without limitation, to the prisoner for discretionary spending?

(This issue is moot with respect to the alternate calculation prescribed by AS 09.19.010(d)—the calculation of the "average monthly deposits" to the prisoner's account. The Department of Corrections funds a prisoner's forced savings account by initially depositing all of the prisoner's available wages into the prisoner's normal account, and then immediately transferring a percentage of those wages to the prisoner's forced savings account. Thus, the amount of deposits into the prisoner's normal account will always be higher than—and will necessarily include—the deposits into the prisoner's forced savings account.)

There was no mention of this fee-calculation problem during the several legislative committee discussions of Senate Bill 310 (24th Legislature), the bill that ultimately became SLA 2006 ch. 58 and that enacted the forced savings account provisions of AS 33.30.201.[4]

The question, as we see it, is whether the Commissioner's decision to require prisoners to pay filing fees from their forced savings accounts is inconsistent with the legislature's mandate, in AS 33.30.201(d), that the "primary purpose" of the forced savings accounts

is to provide funds for prisoners at the time of their release.

As a practical matter, a prisoner who works throughout a lengthy term of imprisonment can accumulate several hundred dollars in their forced savings account—enough money so that the balance in this account equals or exceeds $750. (This is the situation confronting David Esmailka in File No. A–9812.)

If this forced savings account balance is then used to calculate the prisoner's mandatory minimum filing fee under AS 09.19.010(d), the prisoner will be forced to pay the normal filing fee of $150—because the statute requires a mandatory filing fee equal to 20 percent of the prisoner's average account balance, unless that 20 percent would exceed the normal filing fee. Thus, once a prisoner accumulates $750 in their forced savings account, this statutory calculation will always result in the prisoner paying the normal $150 filing fee (since one-fifth of $750 equals $150).

At first blush, this result might seem fair. What difference should it make whether a prisoner has accumulated $750 in their normal account as opposed to their forced savings account? Either way, the money belongs to the prisoner.

But as this Court explained in *George*, the requirement of a mandatory minimum filing

---

4. Note: In the committee minutes listed here, the committees are discussing House Committee Substitute for Senate Bill 310, as amended in the House.

Minutes of the Senate Finance Committee for March 27, 2006, from 9:04 a.m. to 9:23 a.m.: The Committee's discussion centered mainly on how a prison worker program encourages the rehabilitation of the prisoners who participate in the program, by convincing them that there are tangible benefits to honest labor.

Minutes of the House State Affairs Committee for April 13, 2006, from 8:03 a.m. to 8:50 a.m.: The Committee's discussion mainly dealt with the issue of whether working prisoners would be covered by worker's compensation insurance, and the additional problem of making sure that "law-abiding workers" were protected "from competition by criminal workers". (Remarks of Representative Lynn @ 8:44 a.m.)

Minutes of the House Labor and Commerce Committee for April 24, 2006, from 4:25 p.m. to 4:49 p.m.: Darwin Peterson, a member of Senator Lyda Green's staff—whose committee, the

Senate Finance Committee, was the sponsor of the original bill—explained that Senate Bill 310 "was introduced at the request of the Department of Corrections" and that "the intent of the bill [was] to reinstate the Alaska Correctional Industries program, which was [inadvertently] sunsetted, along with the Correctional Industries Commission, in July of 2005." According to Peterson, Senate Bill 310 "would reestablish and improve the aforementioned program." The Committee's ensuing discussion focused almost entirely on the issue of whether prison labor would unfairly compete with private industry and civilian labor. There was no discussion at all of subsection (d), the provision that created the forced savings accounts.

Minutes of the House Finance Committee for April 27, 2006, from 8:52 a.m. to 9:18 a.m.: The Committee's discussion focused almost entirely on the issue of whether prison labor would unfairly compete with private industry and civilian labor. Again, there was no discussion at all of subsection (d), the provision that created the forced savings accounts.

fee was intended to discourage frivolous or "recreational" litigation by confronting prisoners with the trade-off faced by everyone else who initiates litigation: if the prisoner chooses to pursue the lawsuit, they will have to use money that otherwise would have been available to purchase other things that they might want.

This rationale applies to the money in the prisoner's normal account, but it does not apply equally to the money in the prisoner's forced savings account.

A prisoner has ready access to the money in their normal account. They can use it for any permissible purpose—for instance, to purchase clothing, or postage, or candy bars, or to make donations to charity—simply by asking. If the prisoner is required to pay a mandatory filing fee from this account, the prisoner will necessarily lose a portion of their ability to make these discretionary purchases and expenditures. Thus, the legislature's aim of discouraging frivolous litigation will be advanced.

But a prisoner has no discretionary access to the money in their forced savings account. By statute, the primary purpose of this account is to accumulate money for the future—for the day when the prisoner is ultimately released from custody. The legislature has therefore declared that this money can be spent only with the consent of the Commissioner. Although this money belongs to the prisoner, it is beyond the prisoner's reach.

Because of this, there is no immediate "trade-off" when money is taken out of the prisoner's forced savings account to pay a filing fee. This money does not represent funds that the prisoner might otherwise have used for pleasurable or other discretionary purposes. The prisoner's ability to make discretionary purchases is completely unaffected by a reduction in their forced savings account. Rather, the only effect is a long-term effect: less money will be available to the prisoner upon their release.

This leads to a second point. Under the Commissioner's interpretation of the law (i.e., the Commissioner's position that the balance in a prisoner's forced savings account should be included when calculating the mandatory minimum filing fee), prisoners will sometimes be required to pay a substantial filing fee from their forced savings account. The problem arises in this fashion:

A prisoner may have very little current income, or a prisoner may spend about as much as the prisoner earns; in either event, the prisoner will have only a small amount of money in their normal account. But, through prior years of forced savings transfers, the prisoner may have several hundred dollars in their forced savings account. If the balance in that forced savings account is included in the calculation of the mandatory filing fee under AS 09.19.010(d), the prisoner will owe a substantial filing fee—up to and including the normal filing fee of $150. But because the prisoner's normal account contains little money, this mandatory filing fee must come from the prisoner's forced savings account.

Money taken from a forced savings account is commonly replenished only slowly. As explained above, prisoners' wages tend to be low, and after the balance in a prisoner's forced savings account reaches $250, only five percent of the prisoner's wages are transferred to their forced savings account. As a practical matter, this means that it may take a year or two for the prisoner to replenish their forced savings account after a filing fee of $150 has been withdrawn from the account.

Because it may take a prisoner such a long time to replenish their forced savings account, the withdrawal of $100 to $150 from a forced savings account tends to defeat the primary purpose of the forced savings accounts—i.e., the legislative purpose of making sure that prisoners have a modest amount of money when they are released, to ease their transition back into society.

An acute instance of this problem is presented in Baker's case. According to the prisoner account statements furnished by the Department of Corrections, Baker had no income from the beginning of December 2005 through the end of November 2006. During those twelve months, the only deposits to Baker's normal prison account (his "funds available" account) consisted of money trans-

ferred from his forced savings account to pay court filing fees and associated costs (photocopies and postage). And, because of those filing fees, the balance in Baker's forced savings account fell from $210.42 (on December 1, 2005) to $108.87 (on December 5, 2006).

In other words, Baker has lost approximately half of his forced savings to filing fees and associated court costs. And, because he currently has no income, his forced savings account is not being replenished. Nevertheless, the State argues that we should calculate Baker's mandatory minimum filing fee based on the average balance in Baker's forced savings account over the relevant six-month period. This would result in Baker having to pay another filing fee of $31.29—almost one-third of the remaining money in his already depleted forced savings account.

A third point: The Commissioner's interpretation of AS 09.19.010(d), combined with the fact that the prisoners serving the longest sentences are exempt from forced savings, likewise tends to defeat the legislature's purpose of deterring frivolous or "recreational" lawsuits against the State.

As explained above (in the chart), the Commissioner has declared that "[i]nmates serving 8 years or more are exempt from Mandatory Savings." It is unclear whether the Commissioner means that all prisoners who receive sentences of 8 years or more need never make contributions to a forced savings account—or whether, instead, the Commissioner means that these prisoners need not make contributions to a forced savings account until the last 8 years of their sentence. But, in either case, this rule tends to defeat the legislative purpose of deterring frivolous or "recreational" litigation.

Obviously, long-term prisoners generally have a greater incentive to engage in recreational litigation against the State. But under the Commissioner's policy, these prisoners are exempted from having to devote a portion of their wages to a forced savings account (or, at least, they are exempted from this requirement until their final 8 years of imprisonment). Thus, these prisoners who have a greater incentive to initiate frivolous

litigation are, at the same time, less deterred from initiating that litigation: they do not face the prospect of having their mandatory minimum filing fee increased based on the accumulated balance in their forced savings account—because they have no such account.

For these reasons, we reject the Commissioner's position that the balance in a prisoner's forced savings account should be included when calculating the prisoner's mandatory minimum filing fee under AS 09.19.010(d). The Commissioner's interpretation of the statute does not significantly further the aim of deterring frivolous litigation—because, as explained above, a prisoner faces no immediate economic "trade-off" when the filing fee is paid from the prisoner's forced savings account. Moreover, as also explained above, the Commissioner's interpretation of the statute tends to defeat the legislative purpose of making sure that prisoners have some modest amount of money upon their release.

This is not to say that the Commissioner is barred from allowing the money in a prisoner's forced savings account to be used for paying a mandatory minimum filing fee. As explained above, there will be times when, because a prisoner has spent essentially all of their income, the mandatory filing fee will be calculated based on the average monthly deposits to the prisoner's account—and the prisoner will not have money readily available to pay this filing fee. In such instances, it would not necessarily be an abuse of discretion for the Commissioner to authorize payment of the filing fee from the prisoner's forced savings account—just as the Commissioner might likewise authorize the release of forced savings for other emergencies, hardships, or unanticipated needs.

In other words, we do not question the propriety of section VII–B.2 of Department of Corrections Policy 304.01, which states (in pertinent part) that "[m]andatory savings may be used to pay court-ordered filing fees as determined [under] AS 09.19.010." This provision of the Policy appears to be consistent with the Commissioner's authority under AS 33.30.201(d).[5]

---

5. *Compare Wilson v. Dep't of Corrections,* 127 P.3d 826, 829 (Alaska 2006) (quoting *Bartley v.*

But the question presented here is not whether a prisoner's forced savings may properly be *used* to pay a mandatory minimum filing fee. Rather, the question is whether the balance in the prisoner's forced savings account should be included in the *calculation* of that mandatory filing fee. For the reasons explained here, we conclude that the forced savings account balance should not be included in this calculation.

 Based on the account statements provided by the Department of Corrections, Baker had no income during the six months preceding the filing of this petition for review. The only deposits to his normal ("funds available") prison account consisted of money transferred from his forced savings account to pay court filing fees and associated costs. And, except for the few days when the money to pay court costs was temporarily sitting in his normal prison account, the balance of Baker's normal prison account was zero.

It appears that the only reason this money was ever present in Baker's normal prison account stems from the accounting practices of the Department of Corrections. Instead of releasing this money directly from Baker's forced savings account, the Department transferred the money to Baker's normal prison account before allowing it to be spent on filing fees and associated court costs. If not for this practice, Baker's account would have had no deposits, and an average balance of $0.00, throughout the relevant six-month time period. We therefore will ignore this money when calculating Baker's mandatory minimum filing fee under AS 09.19.010(d).

When we perform the calculation specified by AS 09.19.010(d) without reference to the balance in Baker's forced savings account, and without reference to the money that was temporarily transferred from Baker's forced savings account into his normal prison account to pay previous filing fees and associated

*State, Dep't of Admin., Teacher's Ret. Bd.,* 110 P.3d 1254, 1261 (Alaska 2005)): "When an administrative regulation is adopted under statutory authority, [appellate courts] review the regulation to determine whether it is 'consistent with and reasonably necessary to carry out the purposes of the statutory provisions conferring rulemaking authority on the agency' and whether it

ed costs, we find that Baker's filing fee for this appellate litigation is $0.00.

Accordingly, IT IS ORDERED that Baker may proceed with this petition for review without paying a filing fee.

## STATE OF ALASKA DEPARTMENT OF CORRECTIONS

### POLICIES AND PROCEDURES

**Chapter:** Fiscal Management and Prisoner Accounts

**Subject:** Prisoner Wage Disbursal

**Index #:** 304.01

**Effective:** 12/02/05

**Distribution:** Public

**Reviewed:** **Due for Rev:** 12/07

I. Authority

In accordance with 22 AAC 05.155, the Department will maintain a manual comprised of policies and procedures established by the Commissioner to interpret and implement relevant sections of the Alaska Statutes and 22 AAC.

II. References

Alaska Statutes

AS 33.30.201

Alaska Rules of Court

Criminal Rule 32.6(f)

Alaska Administrative Code

22 AAC 05.105

22 AAC 05.106

22 AAC 05.110

Standards for Adult Correctional Institutions, 3rd Edition 1990

3-4031, 3-4044, 3-4045

Standards for Adult Local Detention Facilities, 3rd Edition 1991

is 'reasonable and not arbitrary' considering the legislative purpose.... '[A]n agency's interpretation of a law within its area of jurisdiction can help resolve lingering ambiguity' [in that statute or regulation,] and [an appellate court] should exercise restraint and look for 'weighty reasons' before substituting [its] judgment for the agency's in interpreting a statute or regulation."

3-ALDF-1B-04, 1B-18, 1B-19

### III. Purpose

To establish uniform procedures within the Department for an equitable system for the disbursal of prisoner wages and gratuities.

### IV. Application

To all staff and prisoners.

### V. Definitions

As used in this policy, the following definitions shall apply:

#### A. Mandatory Savings

Money credited to a prisoner for the primary purpose of being available to the prisoner at the time of release.

#### B. Prisoner Dependents

Anyone who is entitled to receive support based upon a court order.

#### C. Prisoner Wages

Money given to a prisoner in exchange for work performed for the Department or at the Department's behest. "Wages" include all earnings and gratuities paid to a prisoner.

### VI. Policy

All prisoner wages will be disbursed in the percentages and priorities determined to be appropriate by the Commissioner.

### VII. Procedures

#### A. Prisoner Wage Disbursal

Prisoner wages shall be disbursed according to the following procedures and order of priority:

| Priority of Allocation | Nature of Priority | Percent of Wages Available for Monthly Allocation |
| --- | --- | --- |
| Priority One | Court-Ordered support for prisoner's dependents. | Up to 40% of wages. |
| Priority Two | State reimbursement for violent crime compensation awarded under AS 18.67.010 arising out of the prisoner's criminal conduct. | Up to 5% of wages. |
| Priority Three | Restitution ordered by sentencing court. | Up to 10% of wages. |
| Priority Four | Civil judgments resulting from the prisoner's criminal conduct. | Up to 5% of wages. |
| Priority Five | For the payment of fees for the prisoner's utilities services under AS 33.30.017. | $3.00 maximum monthly fee. |
| Priority Six | Personal use, including clothing, commissary, and photocopying. | Up to 25% of wages. |
| Priority Seven | Fines ordered by sentencing court. | Up to 10% of wages. |
| Priority Eight | Mandatory Savings Account. | 35% of wages until $250 has been accrued, then 5% of wages monthly. Inmates serving 8 years or more are exempt from Mandatory Savings. |

Any wages remaining after all applicable priorities have been satisfied will be equally allocated to personal use (Priority Six) and mandatory savings (Priority Eight).

#### B. Mandatory Savings

1. Funds designated for placement in a mandatory savings account for a prisoner (Priority Eight), will be retained by the Commissioner for the primary purpose of being available to the prisoner at the time of release. Mandatory savings funds are to be retained in the Offender Trust Account. Mandatory savings funds held in trust will be deposited in this non-interest bearing account and held for the purpose of inmate use upon release.

2. In cases of extreme hardship monies may be disbursed from a prisoner's man-

datory savings account prior to release. Disbursements due to hardship will be at the sole discretion of the Deputy Commissioner. Mandatory savings may be used to pay court ordered filing fees as determined by AS 09.19.010. Approval from the Deputy Commissioner is not necessary for disbursements for charges assessed under AS 09.19.010.

3. The Superintendent shall have the discretion to exempt prisoners from the requirement for mandatory savings on a case-by-case basis due to the length of sentence, age of the prisoner, and other relevant factors.

a. Prisoners who are more than 8 years from their tentative release dates will automatically receive an exemption from the mandatory savings deduction.

C. Prisoner Health Care and Photocopying Expenses

Prisoner health care and photocopying expenses will be deducted from the prisoner's account at least once a month. See Policies 304.02: Prisoner Assets Disbursal, 807.7: Prisoner Responsibility for Health Care, and 808.12: Photocopying for Prisoners.

D. Escape Forfeiture

If a prisoner escapes, all or some part of the prisoner's earnings may be forfeited by the Deputy Commissioner, for deposit into the General Fund. A prisoner may appeal this forfeiture to the Commissioner.

VII. Implementation

This policy and procedure is effective as of the date signed by the Commissioner. Each Manager shall incorporate the contents of this document into local policy and procedure. All local policies and procedures must conform to the contents of this document. Any deviation from the con-

tents of this document must be approved in writing by the Division Director.

December 2, 2005
Date

Marc Antrim, Commissioner
Department of Corrections